Filed 3/11/15  Lutfi v. Spears CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| SAM LUTFI, | B246253 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC406904) |
| v. | |
| LYNNE SPEARS et al., | |
| Defendants and Respondents; | |
| ANDREW M. WALLET, as Coconservator, etc., | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Suzanne G. Bruguera, Judge.  Affirmed in part, reversed in part and remanded.

Law Offices of Gregory R. Ellis, Gregory R. Ellis and Natasha A. Bhushan for Plaintiff and Appellant.

Stephen F. Rohde for Defendant and Respondent Lynne Spears.

Gladstone Michel Weisberg Willner & Sloane, Leon J. Gladstone and Michael J. Aiken for Defendant and Respondent James Parnell Spears.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Linceberg & Rhow, Joel E. Boxer and Bonita D. Moore for Respondents James P. Spears and Andrew M. Wallet as Conservators of the Estate of Britney Jean Spears.

Sam Lutfi (Sam) appeals from a final judgment of the superior court in favor of respondents Lynne Spears (Lynne), James Parnell Spears (James), and Britney Spears (Britney) (appearing through her conservators) on his causes of action for libel and defamation (against Lynne); battery (against James); intentional infliction of emotional distress (against Lynne and James); breach of contract and quantum meruit (against Britney).[1]

After Sam concluded his case-in-chief, all three respondents moved for nonsuit. The court granted the motions in their entirety. Sam contends this was reversible error. Sam also challenges an interim ruling of summary adjudication on his cause of action for intentional infliction of emotional distress against James, and as to emotional distress damages on the battery claim against James.[2]

We affirm in part and reverse in part.

## FACTUAL BACKGROUND

### The relationship between Sam and Britney

Sam met Britney at a nightclub in 2007. At the time, Sam was a "consultant" at his mother's gas station business. When he met Britney, her life was in turmoil. She was involved in a divorce and a child custody battle, and was estranged from her parents. In addition, she was struggling with drug abuse. She had recently fired her agent, manager, bodyguards, and publicist, and she was not working. Sam advised her about the importance of getting clean. Over the next few weeks, Britney called Sam numerous times and sent him hundreds of text messages.

In June 2007, Sam accompanied Britney to a meeting with record executives. The executives asked Sam to leave, but Britney said, "Sam is my manager. He stays." Later that day she told Sam she really did want him to be her manager. Sam said he would

---

[1] Because the three respondents share the same last name, we adopt the practice of the parties in their briefs on appeal and use the first names of all parties to this appeal. No disrespect is intended.

[2] Sam agreed to dismiss his cause of action for intentional infliction of emotional distress against Lynne.

think it over. Britney told Sam that if he accepted, he would get 15 percent of her income, and that she earned $800,000 a month even when she wasn't working. Later that day, Sam accepted her offer with two conditions: (1) he would help assemble a first-rate management team to compensate for his own lack of experience; and (2) Britney would stop abusing drugs. He also told her he wanted to bring drug-sniffing dogs to the house to clear it of any drugs. Britney accepted his conditions. On July 2, 2007, Sam downloaded an exemplar artist management contract and gave Britney a copy. Sam subsequently set up meetings with an entertainment lawyer and agents.

During this time, Britney continued to struggle with a drug problem. Sam claimed to have advised her on this and "almost every important decision in her life." In early or mid-September 2007, Sam walked away from the relationship because Britney was allegedly using drugs. Beginning in September 2007, Britney was subject to a court order requiring random drug testing, and Sam was at the house from time to time when drug testing was done. On October 1, 2007, Britney lost legal custody of her infant sons. She spent a night in a parking lot, then called Sam and told him he was one of the few people she trusted. That night, he moved into her home. With the exception of a brief period in December 2007, Sam lived in Britney's home until February 1, 2008.

In October and December 2007, Sam assisted Britney with such things as arranging parties, purchasing personal items, and interfacing with various people in her life. Sam testified that in October, he and Britney amended the oral agreement to specify a four-year duration and termination without cause in 90 days or with cause in 30 days. Sam claimed that he helped Britney get a music video made and worked with producers on Britney's album "Blackout."

Sam also helped Britney deal with paparazzi; 30 to 100 paparazzi were always trailing Britney. They would run red lights to keep up with her, and follow her into stores, making it difficult for her to park or shop. Sam set rules for the paparazzi, which included not entering private property, not following Britney into stores, not running red lights, and saving Britney a parking space when they followed her to a location. If the paparazzi followed his rules, he would text them Britney's itinerary so they could get the

3

photographs they wanted. By January 2008, Britney and Sam trusted the paparazzi and treated them as free bodyguards.

Over time, Sam ordered five or six cell phones for Britney, each with a different number, to handle the recurring problem of Britney's phone number being leaked to the public. After a leak, she would switch phones. Sam kept the backup phones in his car.

From mid-2007 through January 2008, Sam also established a close relationship with Lynne. They were in touch by phone or text nearly every day. Sam brought up the idea of starting a jewelry business with Lynne. Sam eventually arranged a reconciliation between Britney and Lynne. Sometime in October 2007, he facilitated James dropping off a letter for Britney.

On January 3, 2008, Britney locked herself in a bathroom with one of her children. Someone called the police, and she was removed from her home and taken to Cedars Sinai Medical Center, where she was detained pursuant to Welfare & Institutions Code section 5150 (section 5150 hold).[3] This would be the first of two such section 5150 holds to occur within the next 30-day period.

**The relationship between Sam and Britney ends**

On January 28, 2008, Sam picked up Britney at her boyfriend Adnan Ghalib's house. Sam and Britney had a dispute, and when they were about 200 hundred yards from Britney's home, Britney got out of the car and ordered Sam to leave. Britney began crying. Video images of the dispute were broadcast on the news and the internet.

Lynne and James heard about the dispute and rushed to Britney's home. James got into a verbal altercation with Sam, accusing Sam of hurting Britney. After five or ten minutes, security escorted James from the house. The next morning, James came to pick up Lynne from the home. Sam testified that James "snuck" inside the home, accused Sam of insulting Lynne, and punched Sam once in the solar plexus. Sam retreated and locked himself in the game room for the next hour. Sam testified that the single punch

---

[3]     Welfare & Institutions Code section 5150 provides for a person who is a "danger . . . to himself or herself" to be taken into custody involuntarily for up to 72 hours.

hurt. It left no visible marks, and he felt like he was going to be fine. He did not consider, or obtain, medical treatment.

On January 31, 2008, Britney was taken into custody on a second section 5150 hold. The next day, James filed papers seeking appointment as Britney's conservator. James also applied for a temporary restraining order (TRO) preventing Sam from having further contact with Britney. The application stated that Sam had moved into Britney's home and was controlling her life, home, and finances and that the TRO was necessary to allow her to obtain medical treatment that she needed without Sam's interference. The application was supported by a declaration from Lynne.

**Lynne's declaration filed in support of the TRO**

Lynne's declaration stated that, on January 28, 2008, she and James had attempted an "intervention." However, when he heard that James and Lynne were coming, Sam gave a paparazzo one of Britney's cars to get her out of the house. Lynne stated that she understood from the conversation that Sam had disabled all of Britney's other cars.

Lynne further declared that during a fight between Britney and Sam that evening, Sam had told Britney that she was an unfit mother, a piece of trash and a whore. Lynne stated that the paparazzi reported to Sam like he was "a general." Sam instructed Lynne that she had to do as he told her. Lynne noticed that there was a car battery in the middle of the kitchen table. Sam told her it was there so he could charge his cell phone. He had disposed of all the cell phone chargers and had made the house phones unworkable.

Sam told Lynne and her friend Jackie to tell Britney that her boyfriend, Adnan, was gay. He informed Lynne and Jackie that he would grind up Britney's pills, which were on the counter and included Risperdol and Seroquel, and put them in her food. Sam explained that was the reason that Britney had been so quiet for the past couple of days. Sam said the doctor who was treating Britney was trying to get her into a sleep-induced coma so that they could then give her drugs to heal her brain.

Lynne's declaration also included information she learned from Adnan. Adnan stated that Sam would hide Britney's cell phones and tell her that they were lost. In

5

addition, Sam would hide Britney's dog, London, and when Britney would start crying, Sam would bring the dog out from the hiding place and act like her savior.

Sam testified that Lynne's allegations were untrue.

**Conservatorship of Britney and TRO against Sam**

On February 1, 2008, Britney's person and estate were placed under conservatorship by the probate court. The conservatorship was put in place to protect Britney's health and welfare following her two highly-publicized involuntary hospitalizations.

On February 1, 2008, the probate court issued a TRO against Sam. On July 30, 2008, Sam signed a letter agreement that he would not contact Britney or take any action on her behalf, in return for the conservators' agreement to take the TRO hearing off calendar. On January 30, 2009, another TRO was issued against Sam prohibiting him from contacting Britney or taking any action on her behalf. It was made permanent later that spring.

**Lynne publishes her book**

In September 2008, Lynne's memoir was published. The memoir was titled *Through the Storm, A Real Story of Fame and Family in a Tabloid World*, published by Thomas Nelson Publishing (the book). Three chapters of the book purportedly describe Sam's relationship with Britney, referring to him as a "predator," a "fake," a "Svengali," "the General," and a "gatekeeper." Lynne claimed Sam used the paparazzi as his "henchmen." She also made the following statements in the book:[4]

---

**4**    In his opening brief, Sam lists an additional allegedly defamatory statement in the book: "[Sam] told me that if he weren't in the house to give Britney her medicine, she would kill herself. 'If you try to get rid of me, she'll be dead, and I'll piss on her grave.'" We decline to address this statement, as it was not part of Sam's case in the trial court. Lynne explains that late in the proceedings, Sam attempted to expand the number of statements he claimed to be defamatory. Lynne filed a motion in limine to limit the case to the statements specifically alleged in the FAC, which was granted. Sam has not appealed this ruling.

"The general [Sam] told us that he threw away all of Britney's phone chargers and disabled the house phones by cutting the wires. He also disabled several of Britney's cars so she couldn't leave unattended."

"He then told us to tell Britney that Adnan is gay."

"Sam told Jackie and me that he grinds up Britney's pills, which were on the counter and included Risperdol and Seroquel, and puts them in her food. He said that was the reason she had been quiet for the last three days. She had been drugged and asleep. He said that her doctor was trying to get her into a sleep-induced coma so that they could then give her other drugs to treat her."

"Adnan told me that Sam hid Britney's cell phones and told her that he lost them."

"Adnan told me that Sam would also hide Britney's dog, London. She would look all over the house, crying, and then Sam would bring out the dog and act like some sort of savior."

Sam and Adnan testified that they did not make the statements, and Sam stated that he did not commit the underlying acts.

After Lynne's book was released, Britney's fans assaulted Sam in public, and people he knew began to shun him. He received numerous death threats referring to the book, some aimed at his family. Sam reported the threats to the police but was left feeling depressed, anxious, and suicidal.

## PROCEDURAL HISTORY

### Initial pleadings

Sam filed this lawsuit on February 3, 2009. On April 16, 2009, he filed a First Amended Complaint (FAC). In the FAC, Sam stated causes of action for libel and defamation against Lynne; battery against James; intentional infliction of emotional distress against Lynne and James; breach of contract against Britney and quantum meruit against Britney.

James answered the complaint. Britney's conservators answered in her place and alleged various affirmative defenses, including undue influence. Lynne filed a special

7

motion to strike pursuant to Code of Civil Procedure section 425.16 (anti-SLAPP motion). The trial court denied Lynne's anti-SLAPP motion, finding that Sam had provided sufficient evidence of a prima facie case as to his claims against Lynne, and had established a probability of prevailing on those claims. This court affirmed the ruling.[5]

**Probate court order prohibiting Britney's testimony**

On April 13, 2011, Sam served notice of Britney's deposition. On April 27, 2011, upon application for instructions by Britney's court-appointed counsel, the probate court issued an order under seal prohibiting the conservators from producing Britney as a witness for trial, deposition or any other type of examination conducted in connection with this action (2011 probate court order). The 2011 probate court order was supported by a declaration from a medical practitioner appointed by the probate court pursuant to Evidence Code section 730.

On May 9, 2011, the conservators objected to producing Britney for deposition based on the 2011 probate court order. Sam moved to compel her independent medical examination. On June 15, 2011, the trial court denied Sam's motion, declining to overrule the probate court.

On August 17, 2012, Sam served a notice for Britney to appear at trial. Britney's court-appointed attorney again sought instructions from the probate court, which reaffirmed its 2011 probate court order prohibiting Britney from testifying at trial (2012 probate court order). The 2012 probate court order stated that there had been no material change in the facts supporting the 2011 probate court order. Sam later filed a motion to compel Britney's attendance at trial. The conservators filed objections and a motion to quash. The trial court deferred ruling until Britney was called as a witness at trial.

---

[5] The issue of actual malice, which is the crux of Lynne's current appeal, was not raised as a specific ground for reversal in the appeal of the anti-SLAPP ruling. Instead, Lynne argued that Sam could not make out a prima facie case of defamation because: (1) the cause of action for defamation concerned only protected opinion; (2) the factual statements Sam disputed were true; and (3) Sam was "libel-proof," meaning he was not harmed by the statements in the book because they had previously been published by the news media in connection with Spears's declaration in support of the restraining order.

**James's motion for summary adjudication**

On June 19, 2012, James filed a motion for summary adjudication on Sam's cause of action for intentional infliction of emotional distress and the issue of whether Sam could recover emotional distress damages on his battery claim. In the motion, James claimed that Sam could not show that his claimed emotional distress rose to the level of "severe" or "extreme" distress as required under *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050. James referenced a 2009 declaration filed by Sam in which Sam claimed that he lived a "normal" life until the publication of Lynne's book.

In opposing James's motion, Sam did not deny that he had submitted the 2009 declaration. He claimed that in addition to what he had previously disclosed, he suffered from agoraphobia stemming from his fear of James.

On October 4, 2012, the trial court issued an order granting James's motion for summary adjudication. The court noted that his recent claim that he suffered agoraphobia and an enduring fear of being hunted by James materially and substantially contradicted his earlier deposition testimony that he lived a normal, quiet life until the publication of Lynne's book. The court found that Sam obtained judicial relief when the court acted in reliance on Sam's 2009 declaration, and is now judicially estopped from claiming that he suffered emotional distress prior to the publication of Lynne's book.

Sam's attorney asked for clarification of the ruling and its effect on the battery claim. Counsel and the court agreed that the pain and suffering associated with the alleged battery were not addressed by the motion or covered by the order.

**Motions for nonsuit**

Trial commenced in October 2012. Following Sam's case-in-chief, Lynne filed a motion for nonsuit on Sam's claims against her regarding actual malice and punitive damages pursuant to Code of Civil Procedure section 581c.

James filed a motion for nonsuit on Sam's cause of action for battery. James argued that Sam had failed to provide substantial evidence of injury or compensable harm. He also moved for nonsuit on Sam's claim for punitive damages.

Britney filed a motion for nonsuit on the breach of contract cause of action, arguing that Sam had failed to provide substantial evidence of a contract and failed to rebut the presumption of undue influence.

On November 1, 2012, the trial court issued an order granting the motions for nonsuit for the reasons stated on the record. Judgment was entered on November 28, 2012.

On December 31, 2012, Sam filed a notice of appeal from the judgment.

## DISCUSSION

### I. Motions for nonsuit

#### A. *Standard of review*

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor."' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*).)

"In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation.] We will not sustain the judgment '"unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law."' [Citation.]" (*Nally, supra*, 47 Cal.3d at p. 291.) Bearing this standard in mind, we turn to the merits of the motions for nonsuit granted in this case.

10

### B. *Lynne's motion for nonsuit on Sam's defamation claim*

#### 1. The elements Sam was required to establish

The elements of a defamation claim are: (a) a publication that is (b) false, (c) defamatory, (d) unprivileged, and (e) has a natural tendency to injure or cause special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.)

However, the First Amendment limits the scope of defamation law for a public figure like Sam.[6] "If the person defamed is a public figure, he cannot recover unless he proves, by clear and convincing evidence . . . , that the libelous statement was made with '"actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' [Citation.]" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256 (*Reader's Digest*).)

The term "reckless disregard" has been further explained. "'[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' [Citation.]" (*Reader's Digest, supra*, 37 Cal.3d at pp. 256-257, fn. omitted.)

Thus, the test for determining actual malice is a "subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue. [Citation.] The test directs attention to the 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.' [Citation.]" (*Reader's Digest, supra*, 37 Cal.3d at p. 257.) As the United States Supreme Court has explained, this standard is necessary because "the stake of the people in public business and the conduct of public officials is so great." (*St. Amant v. Thompson* (1968) 390 U.S. 727, 731-732.) "[T]o insure the ascertainment and publication of the truth about

---

[6]    Sam concedes that he is a public figure for the purposes of this analysis.

public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." (*Ibid.*)

"Normal principles of substantial evidence review do not apply to the appellate court's independent review of an actual malice determination in a First Amendment libel case." (*McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 846, fn omitted.) Specifically, "[t]his court is not bound to consider the evidence of actual malice in the light most favorable to [the plaintiff] or to draw all permissible inferences in favor of [plaintiff]. To do so would compromise the independence of our inquiry." (*Ibid.*) "'[T]he constitutional responsibility of independent review encompasses far more than [an] exercise in ritualistic inference granting.' [Citation.]" (*Ibid.*) Thus, we "must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" (*Bose Corp. v. Consumers Union* (1984) 466 U.S. 485, 511 (*Bose*).)

### 2. Evidence regarding actual malice

In arguing that he set forth clear and convincing evidence of actual malice, Sam focuses on his own testimony, and that of Adnan, denying that he made the statements referenced in the book or carried out the acts described in the book.[7] Thus, Sam argues, the evidence clearly and convincingly showed that Lynne attributed to him statements he never made and acts he never committed. Sam contends that these statements are thus defamatory under *Masson v. New Yorker Magazine* (1991) 501 U.S. 496, 511 (*Masson*); and *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132 (*Selleck*).) In sum, Sam argues, evidence that Sam and Adnan never made the statements gave rise to an inference that Lynne fabricated those statements. Sam cites *Burrill v. Nair* (2013) 217

---

[7] Britney's child custody monitor, Ms. Johnson, also supported Sam by testifying that she had used Britney's telephone frequently during the time period in question and it was never out of order. In addition, Ms. Johnson testified that she never observed any of Britney's cars being out of commission.

Cal.App.4th 357, 393 as support for his argument that a jury could have found actual malice on the basis of these allegedly fabricated statements.

Lynne points out that nonsuit is a favored remedy in cases involving free speech. "While nonsuits at this stage are, in general, disfavored . . . , 'unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, [thus] speedy resolution of cases involving free speech is desirable.' [Citation.]" (*Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 965.) "[I]n defamation actions, nonsuit, like summary judgment, is 'a favored remedy.' [Citation.]" (*Ibid.*)

Lynne argues that Sam failed to prove with clear and convincing evidence that at the time her book was published, she knew that the statements were false or acted in reckless disregard of the truth. Lynne contends that the question of actual malice must be evaluated by her state of mind when she published her book in September 2008. (See *Bose, supra*, 466 U.S. at p. 498 [independent evidence must exist that publisher realized the inaccuracy of the statement, or entertained serious doubts about its truthfulness, at the time of publication].) Here, Lynne argues, there is no evidence that she actually knew that any of the statements were false or actually had any doubts as to their veracity. On the contrary, the evidence suggests that Lynne believed the statements to be true. She swore to the truth of the statements in a declaration filed in superior court eight months prior to the publication of her book. During the eight months between the filing of the declaration and the publication of her book, Sam never made any effort to deny or refute those statements. Thus, not only had Lynne sworn under oath to the truth of those statements, Lynne had no idea that Sam disputed the truth of those statements at the time that she published her book.[8]

---

[8] Sam defends his failure to file an opposing declaration, or any other document refuting Lynne's declaration, in the superior court by referring to language in the anti-SLAPP decision in this case (*Lutfi v. Spears* (Nov. 23, 2010, B218211) [nonpub. opn.]). The quoted language is lifted from a discussion of the libel-proof doctrine. Lynne argued that because Sam's reputation was already so tarnished, he could not be harmed by the statements in her book. We pointed out that the statements at issue had been disclosed to the public through news media, which characterized the statements as allegations made in

13

Lynne relies on *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146 (*Annette F.*). In *Annette F.*, the statement at issue, made by Sharon S., was "'*Annette, a convicted perpetrator of domestic violence against me, has made repeated false accusations of child abuse and neglect against me* while actively litigating for sole custody of both children . . . .'" (*Id.* at p. 1158.) Annette initiated a libel action against Sharon based on this statement. In evaluating Sharon's anti-SLAPP motion, the Court of Appeal first determined that Annette's libel action arose from acts in furtherance of Sharon's right of free speech. The court further found that Annette was a limited purpose public figure, therefore the actual malice standard was applicable. The court then went on to analyze Sharon's statement that Annette was a convicted perpetrator of domestic violence, when in fact Annette had never been convicted of any crime. The court quoted *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, which explained that the actual malice standard is "based on a recognition that 'erroneous statement is inevitable in free debate' and 'must be protected' to give freedom of expression the 'breathing space' it needs to survive. [Citation.]" (*Annette F., supra*, at p. 1168.) The court interpreted Sharon's statement that Annette was a convicted perpetrator of domestic violence to refer to a family court finding that Annette had committed domestic violence against Sharon. (*Ibid.*) Annette introduced no evidence to contradict Sharon's declaration as to her belief in the truth of the allegedly defamatory statement, thus Annette failed to carry her burden on the issue of actual malice. (*Id.* at p. 1169.) The court emphasized that "[a]ctual malice may not be inferred solely from evidence of personal spite, ill will, or bad motive. [Citation.]" (*Ibid.*)

---

a court proceeding. This characterization of the statements permitted the public to understand that the statements were not proven fact. Thus, application of the libel-proof doctrine, which generally applies where criminal convictions mar the defendant's reputation, was inappropriate. The fact that the statements were allegations made in a court proceeding does not excuse Sam's failure to refute those statements in the context of his defamation claim. He did not make known his position that the statements were false.

14

The court further explained,

> "[A] critical consideration in determining the weight to be given such factors is the extent to which the allegedly defamatory statement deviates from the truth. False statements that are completely 'fabricated by the defendant' or 'so inherently improbable that only a reckless man would have put them in circulation' are particularly likely to have been made with actual malice. . . .

> "On the other hand, false statements that have some element of truth to them are logically less susceptible to such a finding."

(*Annette F., supra*, 119 Cal.App.4th at pp. 1169-1170.)

Sharon's statement that Annette was a convicted perpetrator of domestic violence was not so far from the truth as to permit an inference of actual malice. The court was left with a "speculative possibility that Sharon might have known or suspected that her use of the word 'convicted' was technically incorrect." Such a speculative possibility fell short of clear and convincing evidence. (*Annette F., supra*, 119 Cal.App.4th at p. 1170.)

Lynne argues that here, as in *Annette F.*, her statements were not inherently improbable. In particular, her statements were in line with Sam's own testimony that he moved in, began managing Britney's life, set rules for the paparazzi, had the authority to authorize who could and could not enter Britney's home, kept cell phones in her car, and was involved in managing her drug rehabilitation and prescription medications. As in *Annette F.*, Sam is left with nothing but the speculative possibility that Lynne simply fabricated these statements, and such speculation is insufficient to show actual malice.

### 3. Analysis under relevant case law

Case law emphasizes that in carrying out an analysis of actual malice, an important distinction must be made. This distinction was set forth by the United States Supreme Court in *Bose*: "[T]here is a significant difference between proof of actual malice and mere proof of falsity." (*Bose, supra*, 466 U.S. at p. 511.) In this case, we must accept Sam's contention that he did not utter the statements or commit the underlying acts referred to in Lynne's book. (See, e.g., *Masson, supra*, 501 U.S. at pp.

15

520-521 [in determining whether Masson has shown sufficient falsification to survive summary judgment, it must be assumed, that he is correct in denying that he made the statements attributed to him].) Thus, we must accept that the challenged statements in Lynne's book are false.

However, the truth or falsity of the statements in Lynne's book must not be the focus of this discussion. Instead, our task is to determine whether Sam provided clear and convincing evidence that Lynne published the statements with actual malice. To do so, Sam was required to show, by clear and convincing evidence, that Lynne either knew the statements were false, or subjectively entertained serious doubts as to their truth. As set forth below, we find that Sam's evidence that the statements were false does not amount to clear and convincing evidence that Lynne published the statements with actual malice.

The evidence in this case supports a conclusion that Lynne believed the statements in the book were true at the time of publication. Eight months before publication, she swore that she heard Sam and Adnan utter those statements in a declaration filed under penalty of perjury. This evidence strongly suggests that whether or not Lynne's recollection was entirely accurate, her subjective belief was that the statements were true. (*Fletcher v. San Jose Mercury News* (1989) 216 Cal.App.3d 172, 190 ["mere errors are not enough to support a libel claim"].) It is possible that Lynne did not remember the conversations clearly, or carelessly interpreted words that Sam uttered. However, even such extreme misconceptions on the part of the publisher do not amount to actual malice. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 88 (*Christian Research*) ["'[g]ross or even extreme negligence will not suffice to establish actual malice'"].)

As set forth above, Sam did not file an opposing declaration or otherwise make known to Lynne that he disputed the accuracy of her sworn declaration. There is no evidence that, at the time of publication, Lynne knew that Sam disagreed with her recollection of the events in question. Even if Lynne were to later admit that she made a mistake and reported the events inaccurately -- which she has not done -- such an

16

admission would not establish that Lynne realized the inaccuracy at the time of publication. (*Bose, supra*, 466 U.S. at p. 512.) In short, Lynne's decision to file a sworn declaration under penalty of perjury in order to get a restraining order against Sam is powerful evidence of her belief in those statements. There is absolutely no evidence that she had any reason to doubt the truth of those statements at the time that her book was published.

Sam insists that his and Adnan's denial of the statements constitute evidence that Lynne entirely fabricated the statements. As Sam points out, actual malice may be inferred where a story is fabricated by the defendant or is completely a product of the defendant's imagination. (*Burrill v. Nair, supra*, 217 Cal.App.4th 357 [father in bitter custody dispute made defamatory statements about reunification therapist in online postings, radio interview, and neighborhood flyer where father cited no source for his accusations and charges were product of his imagination].) While Sam's and Adnan's denials of the statements provide some evidence of fabrication, the denials do not rise to the level of clear and convincing evidence.

"'The burden of proof by clear and convincing evidence "requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind."' [Citation.]" (*Christian Research, supra*, 148 Cal.App.4th at p. 84.) Sam's and Adnan's denials of the statements in Lynne's book must be considered in the context of the very convincing evidence that she believed them to be true. She believed them so adamantly, that she filed a sworn declaration under penalty of perjury in order to prevent Sam from contacting her daughter. In addition, as set forth above, the statements are not so "'"inherently improbable"'" under the circumstances as to give rise to an unambiguous inference of fabrication. (*Annette F., supra*, 119 Cal.App.4th at p. 1170.) Sam admitted to controlling aspects of Britney's life, including deciding who was permitted in her home and whether her parents were permitted to see her. A permanent restraining order is now in place preventing Sam from contacting Britney, which provides a strong suggestion that Sam was not a positive influence in Britney's life.

17

Finally, Sam's and Adnan's denials of the specific statements set forth in the book do not foreclose the possibility that, during this apparently confusing and chaotic time in both Britney's and Lynne's lives, Lynne misunderstood certain utterances or misinterpreted statements that she heard. Sam has not insisted that he never spoke to Lynne about Britney's medications, never spoke to Lynne about Britney's cell phones or house phones, never spoke to Lynne about Britney's cars or about Adnan's sexual orientation. In fact, Sam admits to being involved in Britney's drug addiction recovery efforts and to having some control over her cell phones. The evidence presented allows for the assumption -- in fact, the probability -- that such conversations took place, especially during the time that Sam and Lynne were in close contact. It is not entirely surprising, given the history of the relationship between the parties, that the two may have differing recollections of some of the words exchanged between them. Such misunderstandings do not constitute actual malice.

*Masson* and *Selleck*, cited by Sam in support of his position, are distinguishable. In *Masson*, a noted psychoanalyst sued the publisher and author of a magazine article and book which contained lengthy passages attributed to him in quotation marks. Masson objected to these errors before the publication of both the magazine and the book. The trial court granted summary judgment for the defendants, based on its determination that the alleged inaccuracies were substantially true or were rational interpretations of ambiguous conversations, thus there was no actual malice. The Court of Appeals affirmed, but the United States Supreme Court reversed. The high court disagreed with the lower courts' conclusion that "an altered quotation is protected so long as it is a 'rational interpretation' of the actual statement." (*Masson, supra*, 501 U.S. at p. 518.) The court explained: "Where . . . a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said." (*Id.* at p. 520.) The court had access to tape-recorded interviews that the author did with Masson, therefore it could compare Masson's actual statements with

18

the quoted passages. The high court concluded that some of the published passages differed materially from the tape-recorded statements, and could be considered damaging.

The matter before us is distinguishable. First, the statements challenged in the FAC which Lynne attributed to Sam are not in quotation marks. Therefore, Lynne was not attempting to make a verbatim repetition of Sam's statements, but was conveying her recollection of his words. In addition, unlike the author in *Masson*, Lynne was not aware prior to publication of Sam's disagreement with her recollection of his statements. Therefore, in contrast to *Masson*, there is no evidence that, prior to publication, she knew of the falsity of the statements or had reason to entertain serious doubts as to their truth.

In *Selleck*, the father of a well-known celebrity sued the defendant for an article which followed the headline: "'Tom Selleck's love secrets -- By His Father.'" Many statements in the article were attributed to the plaintiff, who claimed that he had never made any statements to the defendant. (*Selleck, supra*, 166 Cal.App.3d at pp. 1128-1129.) The Selleck court confirmed that "[f]alsely ascribing statements to a person which would have the same damaging effect as a defamatory statement about him is libel. [Citation.]" (*Id.* at p. 1132.) However, the case did not discuss the issue of actual malice; therefore it is not helpful to Sam.

Based on the evidence discussed above, we conclude that any inference that Lynne entirely fabricated the statements set forth in her book is not sufficiently strong to meet the clear and convincing standard. Thus, Sam cannot establish the required element of actual malice, and his defamation claim was properly dismissed.

### C. Britney's motion for nonsuit on Sam's breach of contract claim

The conservators' motion for nonsuit on Sam's cause of action for breach of contract was brought on two independent grounds: (1) lack of substantial evidence of a contract; and (2) failure to rebut the presumption of undue influence.

#### 1. Failure to provide substantial evidence of an enforceable contract

##### a. The parties' arguments

In order to defeat the conservators' motion for nonsuit, Sam was required to present substantial evidence of each of the elements of his case. The conservators'

19

arguments in the trial court focused on the formation of, and existence of, an enforceable contract. They argued that the alleged oral contract Sam described at trial differed materially from the oral contract he pled in the FAC. Due to the resulting vagueness and uncertainty, there could have been no "reciprocal assent to a definite proposition" or the requisite "meeting of the minds" for formation of an enforceable contract. (*Kessinger v. Organic Fertilizers, Inc.* (1957) 151 Cal.App.2d 741, 750.)

Sam argues that a contract need not set forth every term and condition to be enforceable; instead, the evidence must simply show agreement on essential terms. (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481 ["Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable"].) "'Mutual assent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding.' [Citation.]" (*Russell v. Union Oil Co.* (1970) 7 Cal.App.3d 110, 114.) Sam further argues that the law disfavors holding agreements unenforceable because of uncertainty. (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 349 ["""""[t]he law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if [they] can be ascertained . . . .""""].)

### b. *The evidence*

In order to evaluate the parties' competing positions, it is necessary to review the evidence regarding formation of the alleged contract. In his initial complaint, Sam alleged that after they met in 2007, a strong friendship developed between Sam and Britney. Britney sought Sam's advice with respect to almost every important decision in her life. In or about September 2007, at Britney's request, Sam accompanied Britney to a meeting with record company executives to discuss production and release of Britney's new album, "Blackout." At the meeting, the executives were initially reluctant to discuss the details of the record in the presence of Sam. However, Britney "without ever having discussed the matter with [Sam], informed the record company executives that [Sam] was

20

her new 'manager' and gave them authorization to discuss 'Blackout' with her in front of [Sam]."

In the days that followed, Britney repeatedly asked Sam to take on the role of her manager. Beginning in or about October 2007, Sam took on a variety of management services for Britney, including facilitating booking, arranging and coordinating legal meetings, court hearings, doctor visits, child visitation and other matters, including issues concerning the upcoming album. As to the terms of the alleged agreement, Sam stated that he agreed to act as Britney's manager for a term of four years, to be compensated at a rate of 15 percent of the income generated by Britney during that period.

In his FAC, Sam alleged that he and Britney first began negotiating the contract in June 2007. However, the FAC also states that Britney first broached the idea at a meeting with record company executives in September 2007 "without previously having discussed the matter with [Sam]." The FAC alleges that Sam and Britney entered the oral agreement on or about October 13, 2007. As to the material terms of the agreement, the FAC alleges that Sam would be compensated at a rate of 15 percent of all gross revenues earned and received by Britney, and that Sam could terminate the contract with cause on 30 days notice and without cause on 90 days notice.

However, in his deposition, taken April 25, 2011, Sam testified that he could not recall when the alleged contract with Britney began.

At trial, in contrast to his prior allegations, Sam testified that he was hired as Britney's manager in early June 2007. Sam described the meeting with record executives, but now placed the meeting four months earlier. He testified that Britney asked him to be her manger the same day, and he accepted. Sam further testified that he imposed two conditions before he agreed to act as Britney's manager: first, he would assemble a "varsity team" for Britney to make up for his lack of experience; and second, she would promise not to abuse drugs.

In spite of this testimony, Sam testified that he could not recall whether or not he had a contract with Britney when he took her to see her music attorney on July 1, 2007. He also did not know if he was acting as Britney's manager in September 2007 when he

21

walked away from the relationship due to her drug abuse. Sam did not know whether it was before or after September 2007 that he discussed financial terms of the management relationship with Britney. Nor could he recall if that discussion was before or after Britney lost custody of her children on October 1, 2007.

Sam testified that he continued to perform under the alleged management contract until late January 2008, when James obtained a conservatorship over Britney which de facto terminated the contract. Sam was never compensated for his services under the alleged agreement.

Sam acknowledges that there were variances in his allegations regarding the date of the contract, the right to terminate, and the basis for the calculation of his alleged 15 percent compensation. However, he claims that the variances between his trial testimony and his pleadings were immaterial.

### c. Analysis

In analyzing this issue, we first note that within the discussion of substantial evidence, the parties discuss a related question of whether there was a material variance between the pleadings and the proof at trial. We discuss these two topics separately below.

### i. lack of substantial evidence

We begin our analysis with some basic law regarding the question of the existence of an oral contract. In general, "[w]here the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) In particular, "[w]hen the contract relied on is oral, its interpretation in the first instance is a question of fact to be determined by the jury. [Citation.] The question, therefore, [is] one of evidence, and it [is] for the jury to determine from the facts and circumstances proved, including, of course, the conversations between the parties, whether or not a contract was proven. [Citation.]" (*Treadwell v. Nickel* (1924) 194 Cal. 243, 261-262.)

22

The conservators point out that "[i]f no meeting of the minds has occurred on the material terms of a contract, basic contract law provides that no contract formation has occurred." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 797 (*Weddington*).) "'"The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."'" [Citation.]" (*Id.* at p. 811.)

"If, by contrast, a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract. [Citations.]" (*Weddington, supra*, 60 Cal.App.4th at p. 811.) In other words, the conservators' defense of uncertainty "has validity only when the uncertainty or incompleteness of the contract prevents the court from knowing what to enforce. [Citations.]" (*Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 500.) We must determine whether Sam's inconsistent testimony as to the start date, the right to terminate, and calculation of his fees shows insufficient clarity of material terms to enforce the alleged contract as a matter of law.

We find that it does not. As set forth above, it is a factual question for the jury to determine whether an oral contract was formed between Sam and Britney, and if so, to interpret the material terms of that contract.[9] Sam presented evidence that he and Britney

---

[9]    We note that the cases cited by the conservators in support of their argument that the alleged oral contract lacked mutual assent to material terms involve contracts evidenced in writing. (See *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261 [involving automobile advertisement in newspaper that contained typographical error]; *Weddington, supra*, 60 Cal.App.4th 793 [involving a written settlement and subsequent order enforcing the settlement]; *Hennefer v. Butcher, supra*, 182 Cal.App.3d 492 [involving a written contract to sell land]; *Siegel v. Warner Bros. Entm't, Inc.* (2008) 542 F.Supp.2d 1098, 1137-1138 [analyzing a written exchange of letters between the parties and concluding that the writings revealed that the parties had not finalized and assented to all material terms of a settlement].) As set forth above, the existence of a contract is a question of law for the court only when the evidence is not in conflict. (*Bustamante v. Intuit, supra*, 141 Cal.App.4th at p. 208.)

entered an oral agreement in June 2007 in which Britney agreed to pay Sam 15 percent of her income for the term of the contract. Under the relevant standards of review, we must accept this evidence as true and disregard all conflicting evidence. (*Nally, supra*, 47 Cal.3d at p. 291.) Giving this testimony the value to which it is entitled on review, we find that it is sufficient to permit a jury to find in Sam's favor. The conservators were entitled to point out the discrepancies in Sam's testimony regarding the material terms of the alleged contract, and to attempt to convince the jury that Sam's testimony was untrue.[10] However, ultimately the question of the existence of a contract, and the question of the material terms of any such contract, were questions of fact for the jury to decide.

### ii. Material variance between pleading and proof

Within their substantial evidence argument, the conservators raise the issue of material variance. They argued to the trial court that "the alleged oral contract that [Sam] attempted to describe in his trial testimony varied materially from the oral contract he alleged in his pleadings and throughout the litigation." Such material inconsistencies, the conservators argued, show that there could not have been a meeting of the minds.

A material variance is grounds for nonsuit. (*Brazil v. Pacific American Petroleum Co.* (1930) 108 Cal.App. 737, 738.) "'[T]he question whether a variance between pleading and proof in a given case is material must be determined from the circumstances . . . and that a variance is immaterial and may be disregarded where the case was as fully and fairly tried upon the merits as though the variance had not existed.' [Citation.]"

---

[10] The conservators devote many pages of their appellate brief to casting doubt on Sam's trial testimony. They argue that Sam presented no corroborating evidence of his alleged contract with Britney. For example, he took no action to inform Britney's business manager that he had a contract; he did not take basic steps with her record label to show that he was her manager; he failed to allege that he took action that a manager would undertake; he brought no new business to Britney; and he did not assert his contract when circumstances called for him to do so. This evidence is properly presented to a jury for a factual determination regarding the existence of the alleged contract -- not to an appellate court. We decline to make any judgment on the conflicting evidence regarding the alleged contract until a jury or other fact finder has had the opportunity to do so.

(*Gudelj v. Gudelj* (1953) 41 Cal.2d 202, 212.) "In other words, 'a variance to be fatal must have misled or served to mislead the adverse party.' [Citation.]" (*Ibid.*)

Sam argues that a variance in the date of the contract is not material if it has not prejudiced the defendant. In support of this claim, he cites several cases. The first case, *State Medical Education Bd. v. Roberson* (1970) 6 Cal.App.3d 493 (*Robserson*), was an action brought by a lender against a student to whom the lender had loaned money for completion of her medical studies. Summary judgment in favor of the lender was granted, and affirmed on appeal. According to the contract terms, the first payment by the student was due "on or before one year from the date the applicant completes his internship." (*Id.* at p. 496.) In light of the student's May 1966 declaration indicating that she had not, to date, completed her internship, the lender's first motion for summary judgment was denied. (*Id.* at pp. 496-497). However, in November 1968 the lender filed a second motion for summary judgment. The student admitted that she had completed her internship in June 1966. (*Id.* at p. 498.) In arguing that the motion for summary judgment was improperly granted, the student pointed out the variance between the lender's pleading -- which stated that the student had completed her internship in 1962 -- and the proof, which showed that she did not complete her internship until 1966. Under the circumstances, the Court of Appeal concluded "such a variance did not constitute a complete failure of proof of the general scope and meaning of plaintiff's claim; if, as was the case, defendant did in fact complete her internship, it became immaterial . . . whether that event took place in 1962 or 1966." (*Id.* at p. 502.)

In *Marsh Wall Products, Inc. v. Henry Marcus Bldg. Specialties* (1958) 162 Cal.App.2d 371, one of the defendant's arguments on appeal was that the trial court erred in denying his motion to strike out all testimony on the plaintiff's claim for open book account. The defendant argued that there was a material variance between the pleading and the proof. Specifically, the pleading stated that the relevant transactions occurred "on or about July 1, 1954," while the evidence at trial "referred to transactions extending from March 30 to May 25, 1954." (*Id.* at p. 380.) The court pointed out that the complaint did not allege a precise date, but instead claimed that "within four years

25

immediately preceding the commencement of the action, to wit, on or about July 1, 1954, defendants became indebted to plaintiff upon an open book account for merchandise for the reasonable value of $2,075.31." (*Ibid.*) In addition, the defendants did not demand a bill of particulars. (*Ibid.*) Under the circumstances, the Court of Appeal held that the trial court did not err in denying the defendant's motion to strike the relevant testimony.

Finally, Sam cites *Ogden v. United Bank & Trust Co.* (1929) 206 Cal. 571, 574-575 (*Ogden*). In *Ogden*, the contract was for the plaintiff to perform farming work on certain land. When the individuals did not pay the plaintiff for his work, he went to the bank and spoke to an officer of the bank. The plaintiff insisted that "unless the bank would pay for the work done and would be paymaster, he was through and would do no further work." (*Id.* at p. 573.) The plaintiff was paid and an officer of the bank told him to continue to work. On appeal the defendant agued that there was a material variance between the agreement pleaded in the complaint and the agreement proved. Specifically, while the contract alleged what was between the plaintiff and two individual defendants, the proof established an obligation on the part of the bank to pay the plaintiff. (*Ibid.*) Under these circumstances, the court held that "any variance did not mislead defendants to their prejudice and hence cannot be held to be material." (*Id.* at p. 575.)

The cases discussed are instructive. Variances as to dates and specific terms of an alleged contract are not the type of variances that will cause prejudice to the opposing party. "[A] variance between the allegations of a pleading and the proof will not be deemed material unless it has actually misled the adverse party to his prejudice in maintaining his action or defense on the merits." (*Martin v. Henderson* (1954) 124 Cal.App.2d 602, 607.) For example, where "'the judgment rests upon the determination of issues which were neither foreshadowed by the pleadings nor understood by the parties to be in dispute at the trial, and which determination is the result of one party's failure to produce evidence of whose need he has had no warning, we have a case where the departure from the pleadings may not be merely technical, but substantial, resulting in a miscarriage of justice.'" (*Ibid.*)

The contradictions in Sam's testimony regarding the time frame of the alleged contract, and the terms of the alleged contract, do not fundamentally undermine his claim for breach of contract. The elements of a breach of contract claim are: (1) the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damages to plaintiff. (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1614.) Sam never admitted that there was no contract -- on the contrary, he consistently maintained that there was a contract between him and Britney. No miscarriage of justice results from permitting a jury to hear and resolve conflicts in evidence about the dates or terms of any such contract. Many cases that go to trial involve similar conflicts in evidence.

We reject the conservators' argument that Sam's conflicting testimony could not create the existence of a triable fact under *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 (*D'Amico*) and its progeny. The *D'Amico* court explained that when discovery has produced an admission or concession on the part of a party opposing summary judgment which demonstrates that there is no factual issue to be tried, such admission should be given deference when it comes to determining whether a triable issue of fact exists between the parties. (*Id.* at pp. 21-22.) The *D'Amico* rule "'operates to prevent a party from playing "fast and loose" with the courts by creating "sham" issues of fact. . . .'" (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 177.) For example, in *Mikialian v. City of Los Angeles* (1978) 79 Cal.App.3d 150, a truck driver admitted in deposition that his decision to move his tow truck to a certain area was his own decision. (*Id.* at p. 154.) However, at trial, the driver testified three times that officers had directed him where to move the tow truck. (*Id.* at p. 160.) The Court of Appeal determined that the driver's admissions "negat[ed] the claimed duty of the police officers," and that "[t]estimony of [the] plaintiff simply contradicting these admissions did not constitute substantial evidence creating an issue of fact." (*Id.* at p. 158.) Because the admissions prevented the plaintiff from showing the existence of a duty, the trial court properly granted the defendants' motion for nonsuit. (See also *Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 381, 383 [affirming summary judgment where plaintiff

admitted in deposition and interrogatory responses that she had not suffered physical injury but filed a counter-declaration in opposition to the motion contradicting those admissions].)  As *Mikialian* makes clear, the *D'Amico* rule applies when a party has made admissions undermining a fundamental element of his or her case, such as the existence of a duty.

In the matter before us, Sam consistently alleged that he had an oral contract for management services with Britney, that he performed under that contract, that she breached the contract and that he was damaged by the breach.  Under the circumstances, nonsuit was improper.  Questions regarding the existence of the oral contract, the time frame of any such contract, and the terms of the alleged contract, should have been determined by a jury tasked with weighing the conflicting evidence on these factual questions.

### 2.  Undue influence

The conservators advanced a second theory for their motion for nonsuit.  They argued that even if Sam met his evidentiary burden of showing substantial evidence of a meeting of the minds, he did not meet his burden of overcoming the conservators' defense of undue influence.

A presumption of undue influence arises when there is a concurrence of the following elements:  (1) the existence of a confidential or fiduciary relationship between the individuals involved; (2) active participation by the person alleged to have exerted undue influence in preparation of the will or document; and (3) an undue benefit to such person under the document so procured.  (*Estate of Gelonese* (1974) 36 Cal.App.3d 854, 861-862.)  "All three of these factors must be present in order to have the benefit of the presumption."  (*Id.* at p. 862.)

"The presumption of undue influence, when established, is a rebuttable presumption.  [Citations.]"  (*Estate of Gelonese, supra*, 36 Cal.App.3d at p. 862.)  This burden requires proof by a preponderance of the evidence that the agreement was not induced by the alleged perpetrator's undue influence.  (*Ibid.*)

28

"The question whether the evidence adduced by a party who has the burden of proof carries the required weight is for the trier of fact and not the court of review. [Citations.]" (*Estate of Gelonese, supra*, 36 Cal.App.3d at p. 863.) Once again, the conservators present pages of evidence for this court to review in support of their argument that undue influence was established. This court is not the trier of fact. The conservators' extensive factual arguments highlight that the question of undue influence should have been left to the jury. We cannot accept the conservators' version of the facts as true and affirm the nonsuit on that ground.

While there was evidence in the record supporting imposition of the presumption of undue influence, no such finding was made. Given the state of the evidence, we cannot determine as a matter of law that the presumption is properly applied in this case. While Sam admitted to a confidential relationship with Britney, more is required to show entitlement to the presumption of undue influence. The conservators were required to prove that Sam actively participated in soliciting Britney's offer to be her manager. Under Sam's version of the facts, he did no such thing. In addition, the conservators were required to prove that Sam unduly benefitted from the contract. The facts are certainly in conflict on this point. According to Sam, he is owed the standard percentage for management services that he performed during the time in question.

"Nonsuit should be denied when the evidence is substantially conflicting and contrary inferences can be drawn. [Citation.]" (*Meadows v. Emett & Chandler* (1948) 86 Cal.App.2d 1, 10.) Nonsuit on the issue of breach of contract was not properly granted on the issue of undue influence. The matter must be reversed for a determination by the trier of fact as to (1) whether facts existed to support a presumption of undue influence; and, if so (2) whether Sam rebutted that presumption.

### D. James's motion for nonsuit on Sam's battery and punitive damages claims

At trial, Sam testified that James barged into Britney's house and lunged at Sam with his fists balled. James chased Sam around the kitchen island, spitting and shouting, and yelling at Sam, accusing Sam of hurting his daughter and threatening that Sam better leave or "he was going to beat the hell out of me." After five or ten minutes, James was

29

removed from the premises by security. Late the next morning, James got into the house again. He started yelling at Sam, accused Sam of abusing his ex-wife, Lynne, punched Sam in the solar plexus and threatened to kill him. Sam testified that the punch "hurt." He ran to the game room and locked himself in. Sam did not seek medical assistance for his injury, because he felt he was going to be fine. There was no visible mark left on him from the incident.

In his motion for nonsuit, James argued that Sam failed to present a prima facie case of battery. First, James argued that his intent was to protect his daughter, not harm Sam. In addition, James argued that Sam's testimony established that he did not suffer compensable harm. James cited *Hansen v. Bledsoe* (1955) 130 Cal.App.2d 70, as support for his position that Sam's testimony that the punch "hurt" was insufficient as a matter of law to support a prima facie case of battery.[11]

On appeal, James has abandoned his argument that there was insufficient evidence of intent to harm. Instead, he focuses on his argument that Sam did not present sufficient evidence of damages. James cites *Fluharty v. Fluharty* (1997) 59 Cal.App.4th 484, 497, which sets forth the elements of a battery claim: "'"1. Defendant intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person; [¶] 2. Plaintiff did not consent to the contact; [and] [¶] 3. The harmful or offensive contact caused injury, damage, loss or harm to the plaintiff.'" [Citation.]"

James cites *Chaparkas v. Webb* (1960) 178 Cal.App.2d 257, 259 (*Chaparkas*) for the proposition that damages must be proved with reasonable certainty. *Chaparkas* was an appeal after a jury trial on an action for negligence following an automobile accident. The jury found in favor of plaintiff Peter Chaparkas, but awarded him no damages.[12] On

---

[11]   *Hansen v. Bledsoe* was an appeal from a final judgment following a court trial. The appellant's contention was that the evidence at trial did not support the sum awarded for general damages. (130 Cal.App.2d at p. 74.) The matter was remanded for a retrial on all issues. (*Ibid.*) The case does not suggest that Sam's testimony at trial was insufficient to set forth a prima facie case of battery.

[12]   The jury awarded his wife, Josephine Chaparkas, $4,500 in damages.

appeal, Peter Chaparkas contended that the evidence required a finding of damages in his favor. (*Ibid.*)  The appellate court disagreed.  After reciting the vague and conflicting evidence that was presented at trial, the court explained, "[f]rom the foregoing evidence it is readily apparent that appellant Peter has failed to maintain his burden of proving his injuries or damages with reasonable certainty or, that if he sustained any damages, they were proximately caused by any negligent act of defendants." (*Id.* at p. 262.)  The *Chaparkas* court's determination that the jury was free to refrain from awarding damages does not suggest that a nonsuit is appropriate in the matter before us.

*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1384-1387 is also distinguishable.  The plaintiffs were owners and renters of certain residential property who brought a toxic tort action against various defendants for personal injuries and property damage as a result of the development of the property on a hazardous waste site. (*Id.* at p. 1371.)  Under these circumstances, the Court of Appeal agreed with the trial court's decision that certain plaintiffs had to establish physical injury under a standard of reasonable medical probability based on expert testimony.  However, the issue in *Cottle* was *causation*, not damages.  The court stated:  "In order to recover damages for physical injury, petitioners would need to introduce evidence that to a degree of reasonable medical probability, their injuries had been caused by exposure to chemicals." (*Id.* at p. 1385.)  Here, in contrast to *Cottle*, expert testimony stating that the punch to the solar plexus caused the alleged pain that immediately ensued is unnecessary.

*Miller v. San Diego Gas & Electric Co.* (1963) 212 Cal.App.2d 555 (*Miller*) likewise does not support James's position that Sam did not make out a prima facie case of battery.  The case involved alleged injuries arising from an electric shock which occurred due to the defendant's negligence.  The plaintiff testified as to extensive injuries and provided evidence that her total medical bills amounted to $1,133.18. (*Id.* at p. 557.)  The jury returned a verdict in her favor, and awarded her damages of exactly $1,133.18.  The plaintiff's main contention on appeal was that the jury's verdict was inadequate. (*Ibid.*)  The court disagreed, noting that "there was a substantial conflict as to whether plaintiff received any substantial injury." (*Id.* at p. 560.)  Thus, it was "entirely probable

that the jury felt that although plaintiff was entitled to no more than nominal damages, the kindest disposition of the case was to award her an amount at least equivalent to her medical bills." (*Ibid.*) Again, the case does not involve nonsuit, but affirms a jury's right to decide the appropriate amount of damages.

*Barouh v. Haberman* (1994) 26 Cal.App.4th 40, was also an appeal from a jury trial. There, the jury found by a nine-to-three majority that the defendant did not commit battery. (*Id.* at p. 42). There was substantial conflict in the evidence as to whether the touching that occurred was a hard blow or a "'love tap'" between friends. (*Id.* at pp. 43-44). While the Court of Appeal found that substantial evidence supported the jury's verdict, it reversed the matter due to a jury instruction which defined a battery as "'any intentional, unlawful and harmful contact by one person with the person of another.'" (*Id.* at p. 44, fn. 1.) The court held that the term "'unlawful'" was misleading and resulted in a miscarriage of justice. (*Id.* at pp. 45-46.)

Finally, *McChristian v. Popkin* (1946) 75 Cal.App.2d 249 was an appeal from a jury trial which resulted in a verdict in favor of the plaintiff for $10,000. In addressing the defendants' contention that the verdict was not supported by the evidence, the Court of Appeal stated: "'It is the province of the jury and then of the trial court upon motion for new trial, to determine and fix the amount of damages awarded a litigant.'" (*Id.* at p. 263.)

All of the above cases discussed by the parties suggest that a determination as to whether the plaintiff is entitled to damages lies with the jury. None suggest that Sam's testimony that James's alleged punch "hurt" was insufficient to permit a jury to determine whether Sam was entitled to damages.

In *Fairfield v. American Photography Equipment Co.* (1955) 138 Cal.App.2d 82, a judgment of nonsuit was granted on the plaintiff's action for unauthorized use of his name on the ground that there was no proof of damages. The appellate court reversed, stating: "[i]t is error to grant a motion for judgment of nonsuit if the plaintiff is entitled to any relief." (*Id.* at p. 85.) The court explained, "In a case of this character there can be no direct evidence of the amount of damages sustained, nor the amount of money which

will compensate for the injury. The measure of damages therefore is for the trier of fact, and in assessing such damages he is accorded a wide and elastic discretion. [Citation.]" (*Id.* at p. 88.) Here, as in *Fairfield*, there is no direct evidence of the amount of damages sustained or the amount of money that would compensate Sam for his alleged injury. Under the circumstances, nonsuit is improper. Instead, it is up to the jury to determine the correct measure of damages.

Similarly, in *Scofield v. Critical Air Medicine, Inc.* (1996) 45 Cal.App.4th 990 (*Scofield*), the Court of Appeal discussed a cause of action for false imprisonment where there was no evidence of physical harm to the two children who were victims of the false imprisonment. In concluding that physical harm was not a necessary element of the tort, the Court of Appeal discussed the right of a plaintiff to bring the case to a jury where the defendant has incurred a technical liability, even where no damages are shown. (*Id.* at pp. 1007-1008.) The court described false imprisonment as a "'dignitary tort,'" designed for recovery when an individual knows of the dignitary tort or is harmed by it. The court stated, "In view of the nature of the interest protected, it is appropriate a cause of action may be brought even where the damage is purely nominal." (*Id*. at p. 1008.) The court cited Civil Code section 3360, which provides: "When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages." The court pointed out that the advantages of an award of nominal damages -- other than psychological -- are: (1) the plaintiff is entitled to costs; and (2) the plaintiff may be entitled to punitive damages. (*Id.* at pp. 1007-1008.) Nominal damages are also available for battery. (*Keister v. O'Neil* (1943) 59 Cal.App.2d 428, 435.) Here, as in *Scofield*, a technical battery provides the foundation for an award of nominal damages.[13]

---

[13]     In supplemental briefing, James has cited *Maher v. Wilson* (1903) 139 Cal. 514. Like *Scofield*, *Maher* was an action for false imprisonment. The plaintiff had been wrongfully arrested and detained for an hour and a quarter. He had no employment at the time and therefore did not lose wages or time by his absence. The jury awarded him $1,000 on his claim for false imprisonment, and the defendants brought a motion for new trial, which was denied upon the plaintiff's agreement to take only half of the jury's award. The Supreme Court concluded that the motion should have been granted because

James admits that Sam might have been entitled to nominal damages if his case went to the jury. He argues that an erroneous failure to award nominal damages is not grounds for reversing this judgment. However, the cases James cites are distinguishable. Two are appeals taken after a jury chose not to award damages. (*Chaparkas, supra*, 178 Cal.App.2d at p. 259; *Keister v. O'Neil, supra*, 59 Cal.App.2d at p. 435.) The third is a case where a default was entered and the trial court declined to award damages. (*Liljefelt v. Blum* (1917) 33 Cal.App. 721.) In none of these cases was the issue of damages taken from the jury. Instead, the fact finders chose not to award damages. The cases do not address the question of whether a nonsuit is properly granted on a cause of action for battery where the only evidence of damages is pain. Here, the fact finder was not given the opportunity to evaluate the evidence and decide whether any amount of damages was appropriate. Under the circumstances, reversal is warranted for a factual determination of whether damages should be awarded in this case.

Similarly, and contrary to James's arguments, it is for the jury to determine whether punitive damages are warranted based on the evidence. We reject James's argument that no reasonable jury could find it highly probable that James was intent on hurting Sam. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [in determining award of punitive damages, jury must consider nature of defendant's acts; amount of compensatory damages awarded; and wealth of the particular defendant].)

## II. Motion for summary adjudication

James filed a motion for summary adjudication of Sam's intentional infliction of emotional distress (IIED) claim against him as well as adjudication of the emotional distress damages component of Sam's battery claim against him. James argued that an individual cannot recover damages for emotional distress unless it is so "severe or

---

there was no evidence that the plaintiff sustained any actual damage from his brief false imprisonment. However, the high court noted that the defendants had "incurred a technical liability, entitling the plaintiff to nominal damages." (*Maher, supra*, at p. 520.) The case does not convince us that it is appropriate to remove from the jury the question of damages in situations where, as here, a plaintiff has testified to physical pain resulting from an alleged battery.

extreme" that "'"'no reasonable [person] in civilized society should be expected to endure it.'"'" [Citation.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051 (*Hughes*).) James argued that even accepting Sam's allegations of emotional distress as true, they fall far short of what the Supreme Court required in *Hughes*. In addition, James pointed out, in the prior proceedings involving Lynne's anti-SLAPP motion, Sam attested that his distress was due to the negative publicity he received from Lynne's court declaration and book. James claimed that even if Sam did suffer severe or extreme emotional distress, he should be estopped from doing so because he stated in a prior declaration that his emotional distress arose from Lynne's actions, not James's actions, and he obtained a favorable ruling from the court based on that declaration.

The trial court granted the motion for summary adjudication on Sam's fourth cause of action for intentional infliction of emotional distress. The court also granted summary adjudication as to Sam's "allegation and claim for damages for emotional distress resulting from the battery of January 29, 2008."

The trial court found that Sam did not set forth sufficient evidence of damages to support his claim for IIED. Sam's statement that he suffered "'terror . . . agoraphobia, and an enduring fear of being hunted and killed by James Parnell'" was insufficient because this "materially and substantially contradicts his previous deposition testimony, in which he clearly testified that his emotional distress was limited to anxiety, insomnia, and fear from the threats made by members of the public as a result of publicity about February 1, 2008, TRO application and/or Lynne Spears's book." The court stated that Sam is bound by this testimony, and may not raise a triable issue by contradicting it now. In addition, Sam obtained judicial relief when the court acted in reliance on that declaration, therefore Sam was judicially estopped from claiming that he suffered extreme emotional distress prior to the publication of Lynne's book in September 2008.

As to the emotional distress component of the battery claim, the court found that judicial estoppel applied due to the prior conflicting testimony.

## A. *Standard of review*

The standard of review for an order granting or denying a motion for summary judgment or adjudication is de novo.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).)  The trial court's stated reasons for granting summary relief are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale.  (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

A party moving for summary adjudication "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar, supra*, 25 Cal.4th at p. 850, fn. omitted.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.)  "A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto.  [Citation.]" (*Ibid.*)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . .  A prima facie showing is one that is sufficient to support the position of the party in question.  [Citation.]" (*Aguilar, supra*, 25 Cal.4th at pp. 850-851, fn. omitted.)

## B. IIED

### 1. James's burden:  nonexistence of triable issue of material fact

In support of his motion, James filed a separate statement of undisputed facts.  In it, he included the following facts:  "As a result of the media reports regarding the TRO and declaration filed in support of the application, [Sam] began receiving insults and threats from Britney's fans."  "Plaintiff was not harassed in public until *after* reports of the contents of Lynne Spears's judicial declaration (in support of the application for the TRO) were published or otherwise made public."

36

James admitted that Sam testified in his deposition that his "distress injuries are insomnia, anxiety, and fear of being in public." However, citing Sam's deposition, he also included as an undisputed fact: "Plaintiff attributes his fear of being in public to publication in the press and on the internet of the statements made about him in the February 2008 judicial (TRO) proceedings."

James referred to Sam's declaration filed in opposition to Lynne's anti-SLAPP motion. James provided the following undisputed fact: "Plaintiff stated under penalty of perjury that in the months following the issuance of the February 2008 TRO against him, he lived a 'normal, quiet and private life, far away from the press and media . . . and free from public scrutiny, hatred, contempt, ridicule and obloquy." In addition, "[i]n his July 2009 Declaration, [Sam] told the Court that the public threats and his difficulty sleeping did not start until after Lynne Spears published her book in September 2008." Sam obtained a favorable ruling on the anti-SLAPP motion based, in part, on his declaration.

James's motion sought to do two things: first, to show that Sam's claims of distress were insufficiently severe to withstand summary judgment; and second, to undermine the causation element of Sam's alleged emotional distress and show that Sam had already admitted that such emotional distress was a result of a different event: the publication of Lynne's allegations against him.

### 2. Sam's burden: triable issue of material fact as to emotional distress

In opposition to James's motion, Sam filed his own separate statement. He stipulated to some of the undisputed facts listed in James's separate statement, but changed the wording in his admissions. For example, instead of admitting that he "was not harassed in public until after" Lynne's declaration in support of the TRO was made public, he stated: "The entire [T]RO application was leaked . . . . Thereafter, Plaintiff was harassed in public . . . ."

Sam disputed the alleged fact that, in his 2009 declaration, he "told the Court that the public threats and his difficulty sleeping did not start until after Lynne Spears published her book in September 2008." Instead, he stated that his first bout of insomnia came after James's January 2008 threats and assault. However, his "difficulty sleeping

37

was aggravated by the wave of harassment and death threats following the leak of the [T]RO application to the press." The harassment and threats died down until publication of Lynne's book and her book tour, at which time the threats and harassment spiked.

Sam also disputed James's statement that Sam "attributes his fear of being in public to publication in the press and on the internet of the statements made about him in the February 2008 judicial (TRO) proceedings." Sam stated that his agoraphobia started with the threats and assaults from James. It was then aggravated by the public harassment and death threats he received after publication of Lynne's allegations against him.

In his July 2009 declaration, Sam's precise words were as follows:

> "As a result of the Book, and the public scorn I have been subjected to as a result thereof, I am constantly in fear for my life and safety and the life and safety of my friends and family. I have been subjected to cruel and unusual criticism, name calling and racial slurs. As a result of the foregoing, I am also unable to get a good night's sleep and have been forced to seek counseling to help me cope with these issues."

However, Sam also testified in his November 9, 2011 deposition that he suffered from a fear of going out in public after he was threatened by James on January 28, 2008, the day before the alleged battery. When asked, "What else is it that you attribute to your fear of going out in public?" Sam replied, "Everything starting from the menacing texts that your client sent me" to "the battery on the 29th."

### 3. Analysis

To state a cause of action for IIED, a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intent to cause or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. (*Johnson v. Ralphs Grocery Co.* (2012) 204 Cal.App.4th 1097, 1108.)

There are two distinct issues before us. The first concerns the third element of a claim for IIED: whether Sam suffered severe or extreme emotional distress sufficient to

survive summary judgment on this cause of action. The second concerns the fourth element: whether Sam is judicially estopped from claiming that his emotional distress began after the incident with James in late January 2008, due to his prior sworn statement that his emotional distress was caused by the subsequent publication of Lynne's statements in the TRO proceeding and in her book.

In granting James's motion for summary adjudication, the trial court held that Sam is "judicially estopped from claiming that he suffered severe or extreme emotional distress prior to the publication of Lynne Spears's book in September 2008." Thus, the trial court was focused on the fourth element of the cause of action for IIED: causation. The trial court's stated reasons for granting summary relief are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs, supra*, 95 Cal.App.4th at p. 878.)

As set forth below, we find that the evidence before the court at the summary judgment stage did not meet the standard set forth by the Supreme Court requiring ""'"emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'"' [Citation.]" (*Hughes, supra*, 46 Cal.4th at p. 1051.) Because we find that Sam's evidence of emotional distress was insufficient to create a triable issue of fact as to this element of his IIED claim, we need not reach the issue of causation.

The Supreme Court has set a high bar for emotional distress damages. In *Hughes*, the high court discussed a claim of IIED brought by the guardian of a beneficiary of a trust against the trustee of the trust. The guardian alleged that the trustee made sexual comments and sexual advances towards her, and that this behavior caused emotional distress. (*Hughes, supra*, 46 Cal.4th at pp. 1040-1041.) The trial court granted summary judgment on the plaintiff's IIED cause of action, and the Supreme Court agreed that summary judgment was properly granted on this issue. The Supreme Court held that the trustee's conduct fell far short of conduct that is so outrageous that it exceeds the bounds of what is normally tolerated in a civilized society. In addition, the plaintiff failed to provide evidence that she suffered extreme emotional distress.

39

The high court explained that in order to avoid summary judgment on a claim of IIED, the plaintiff must provide evidence of "'""'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure.'""' [Citation.]" (*Hughes, supra*, 46 Cal.4th at p. 1051.) "Liability for intentional infliction of emotional distress '"does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations.]" (*Ibid.*) The court concluded that the plaintiff's assertions that she "suffered discomfort, worry, anxiety, upset stomach, concern, and agitation as a result of defendant's comments" did not constitute emotional distress of sufficient substantial or enduring quality to survive summary judgment. (*Ibid.*)

In *Wong v. Jing* (2010) 189 Cal.App.4th 1354 (*Wong*), the Court of Appeal addressed a case involving allegedly false assertions posted on Yelp that criticized the dental services provided by the plaintiff dentist to the defendant's young son. (*Id.* at p. 1359.) The plaintiff asserted causes of action for libel and negligent and intentional infliction of emotional distress. (*Id.* at p. 1360.) In response, the defendants filed an anti-SLAPP motion. In discussing whether plaintiff had established a probability of prevailing on her IIED claim, the court discussed the requirement of severe emotional suffering. It explained:

> "Wong alleged in her complaint that the posting caused her to suffer 'severe emotional damage.' However, in her declaration, she stated only that the review 'was very emotionally upsetting to me, and has caused me to lose sleep, have stomach upset and generalized anxiety.'

> "This minimal showing does not reflect emotional distress that was any more severe, lasting, or enduring than that shown in connection with the summary judgment motion in *Hughes*, and we reach the same conclusion reached by our Supreme Court. Wong's alleged emotional reaction to being professionally criticized in a Yelp review, however unjustified or defamatory that criticism might have been, does not constitute the sort of severe emotional distress of such lasting and enduring quality that no reasonable person should be expected to endure. [Citation.]"

(*Wong, supra*, 189 Cal.App.4th at p. 1377.)

Under the case law discussed above, in order to survive summary judgment, Sam had to provide evidence of distress more severe than anxiety, loss of sleep, and general agitation.  He did not.  In his deposition, Sam testified that his emotional distress was limited to "insomnia, anxiety, [and] fear of going out in public."[14]  In addition, as James points out, Sam swore under penalty of perjury that he lived a "normal" life until the publication of Lynne's book in September 2008.  Emotional distress is only actionable if it presents symptoms which interfere significantly with a "normal" life.  Having testified that his life was normal in the months following the alleged battery and up until the publication of Lynne's book, Sam cannot now create a triable issue of fact by contradicting himself.  (*Thompson v. Williams* (1989) 211 Cal.App.3d 566, 574, citing *D'Amico, supra*, 11 Cal.3d 1 ["The assertion of facts contrary to prior testimony does not constitute '"substantial evidence of the existence of a triable issue of fact"'"].)

We conclude that the evidence of Sam's alleged emotional reaction to the battery does not show severe or extreme emotional distress of such lasting and enduring quality that no reasonable person should be expected to endure it.  (*Wong, supra*, 189 Cal.App.4th at p. 1377.)  Sam failed to state a cause of action for IIED, and summary adjudication was properly granted on this cause of action.

### C.  *Emotional distress component of battery claim*

In addition to granting summary adjudication of Sam's IIED claim, the trial court granted summary adjudication of the emotional distress damages component of Sam's battery claim.  On appeal, Sam argues that this portion of James's motion for summary adjudication was procedurally defective.  Sam recognizes that former Code of Civil

---

**14**     Specifically, Sam testified that these were the only symptoms of emotional distress that he could recall at that time.  However, if there were any additional symptoms of Sam's alleged emotional distress which were sufficiently severe and enduring to withstand summary judgment, Sam should have testified to those symptoms at the time of his deposition.  It logically follows that any symptom of emotional distress of substantial and enduring quality is one that is not easily forgotten.

Procedure section 437c, subdivision (s) (section 437c),[15] permits summary adjudication of a legal issue or claim for damages that does not completely dispose of a cause of action. (Former § 437c, subd. (s)(1).) However, Sam argues, use of former section 437c, subdivision (s) requires adherence to certain specified procedures, none of which happened here. (Former § 437c, subd. (s)(1)-(6).)

James argues that, having failed to raise this issue in the trial court, Sam has forfeited his right to make this argument on appeal. We agree.

Sam admits that an appellate court will ordinarily not consider procedural defects unless the objecting party first presented the issue to the trial court. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 ["'An appellate court will not ordinarily consider procedural defects . . . where an objection could have been but was not presented to the lower court by some appropriate method . . . the explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial'"].)

However, Sam argues that the purpose of the forfeiture rule is not implicated here. He states, without explanation, that the procedural issue in question was not timely correctable. Sam cites no case law indicating that the general rule of forfeiture should not be applied under the circumstances of this case. We therefore find that Sam has forfeited this issue, and the summary adjudication of the emotional distress component of damages for Sam's battery claim is affirmed.

## III. Evidentiary rulings

Sam has raised several evidentiary issues in this appeal: (1) the trial court's decision to defer to the probate court order barring the conservators from permitting Britney to testify in this case; (2) the trial court's decision to bar discovery of Britney's

---

[15]    (See Stats. 2011, ch. 419, § 4, operative Jan. 1, 2015.)

drug tests and exclude them at trial;**16** and (3) the trial court's decision to exclude exhibit 11, a threatening text message from James to Sam.

We have determined that Sam's causes of action for breach of contract and battery must be reversed and remanded for a new trial. In order to provide assistance to the court on remand, we deem it appropriate to address two of these remaining evidentiary issues. We will address the trial court's decision to defer to the probate court's order precluding Britney's testimony because it is relevant to the breach of contract claim. We will also address the trial court's decision to exclude exhibit 11, as it is relevant to Sam's battery claim.

### A. Exclusion of Britney's testimony

Sam filed a motion to compel Britney's appearance at trial. The conservators filed objections and a motion to quash based on the orders instructing conservators dated April 27, 2011, and September 24, 2012, filed in the *Matter of the Conservatorship of the Person and Estate of Britney Jean Spears*, Los Angeles Superior Court case No. BP108870. The trial court deferred ruling on the motion until Britney was called as a witness at trial. On October 30, 2012, Sam called Britney as his final witness. After Sam's counsel stated that he had not attempted to have the 2012 probate court order vacated or modified, the trial court ruled that Britney could not be called as a witness based upon that order.

On appeal, Sam argues that every person is presumed competent to testify. While there are statutory exceptions to this rule, Sam argues, the conservators never made any showing that Britney was not competent to testify. Sam argues that the trial court's decision to defer to the probate court order thus denied Sam his federal due process right to call a material witness in this proceeding.

---

**16** We decline to address Sam's contention that the trial court should have permitted him to present evidence of the results of certain drug tests administered to Britney. Lynne had accused Sam of drugging Britney, and Sam sought to refute that claim by introducing the drug test results. Because we affirm the motion for nonsuit as to Sam's libel claim, we need not address this evidentiary issue.

We conclude that the trial court erred in deferring to the probate court order without making its own findings regarding Britney's ability to testify.[17] As discussed below, none of the authority cited by the conservators supports the proposition that one department of the superior court has the power to prevent a witness from testifying in another unrelated matter.

Both parties cite *People v. Riva* (2003) 112 Cal.App.4th 981 (*Riva*), each side claiming that the case supports its respective position. We find that the case supports the proposition that, in a separate proceeding, orders of another court of equal authority are not binding. In *Riva*, the Second Appellate District addressed the question of whether, following a mistrial, a new judge assigned to the case may overrule the previous judge's pretrial ruling on the defendants' motion to suppress statements made to the police. The *Riva* court concluded that it could. While acknowledging the rule that one trial judge cannot reconsider and overrule an order of another trial judge in the same proceeding, the *Riva* court noted that the Supreme Court has held that "reversal of a judgment on appeal and remand for a new trial 'permits [the] renewal and reconsideration of pretrial motions and objections to the admission of evidence.'" (*Id.* at p. 991-992, fn. omitted.) The court concluded that "pretrial rulings on the admissibility of evidence, like rulings on pleadings, should be reviewable by another judge following a mistrial." (*Id.* at p. 992.) If a judge is not bound by rulings of previous judges following mistrial in the same case, it logically follows that judges are not bound by rulings of judges in unrelated matters.

The conservators string cite law suggesting that courts must respect the orders of other courts that have first assumed jurisdiction of a matter. However, a close look at

---

**17** The trial court's evaluation of the issue should begin with the Evidence Code. Evidence Code section 351 states that all relevant evidence is admissible unless it can be excluded under a specific statute or Constitutional provision. (See also *People v. Heard* (2003) 31 Cal.4th 946, 972-973 ["Only relevant evidence is admissible . . . , and all relevant evidence is admissible unless excluded *under the federal or California Constitution or by statute*," italics added].) A court order is therefore insufficient to render the evidence inadmissible.

44

those cases reveals that they are distinguishable because they all involve judges considering prior rulings in the same matter.

*Williams v. Superior Court* (1939) 14 Cal.2d 656, involved a court reporter. The petitioner took an appeal from an adverse judgment and came to an agreement with the court reporter to provide the record for her case to the Court of Appeal. When the reporter did not do so, the petitioner brought the matter to the attention of the presiding judge of the superior court. The presiding judge, after investigating the matter, directed that the issue be handled by the judge of the order to show cause department (department 34). (*Id.* at p. 660.) After he was admonished for contempt for failure to comply with an order issued by department 34, the court reporter filed an ex parte motion in department 12, seeking an order to extend the time to file the transcript under different contractual terms. Department 12 issued an order declaring the order of department 34 void, among other things. (*Ibid.*) Under these circumstances, the *Williams* court declared "where a proceeding has been duly assigned for hearing and determination to one department of the superior court by the presiding judge of said court in conformity with the rules thereof, and the proceeding so assigned has not been finally disposed of therein or legally removed therefrom, it is beyond the jurisdictional authority of another department of the same court to interfere with the exercise of the power of the department to which the proceeding has been so assigned. [Citation.]" (*Id.* at p. 662.) The case does not suggest that the trial court in this matter was bound by an order issued in the guardianship proceeding. Instead, the trial court in this matter had jurisdiction over all aspects of the matter before it, and the probate court had no power to interfere.

*In re Alberto* (2002) 102 Cal.App.4th 421 (*Alberto*) was a habeas corpus proceeding in which the defendant had initially been charged with first degree residential burglary. The trial judge set bail at $35,000. Later, a grand jury indicted the defendant on one count of attempted murder and one count of second degree robbery. A second judge, to whom the matter had been assigned for all purposes, increased the bail to $1,035,000 based on the belief that the first judge's bail determination was erroneous. Under these circumstances, the Second Appellate District held that the second judge

45

erred by increasing bail solely on the ground that it believed the first judge's ruling was erroneous. (*Id.* at p. 423.) The court explained, "the power of one judge to vacate an order made by another judge is limited. [Citation.]" (*Id.* at p. 427.) The court stated, "[f]or one superior court judge, no matter how well intended, even if correct as a matter of law, to nullify a duly made, erroneous ruling of another superior court judge places the second judge in the role of a one-judge appellate court." (*Ibid.*) In contrast to this matter, the *Alberto* case involved a second judge in a single matter overruling an order of a prior judge in that same matter. The case does not stand for the proposition that the trial court in this matter was required to submit to an order of the probate court.

Finally, the conservators rely heavily on *Glade v. Glade* (1995) 38 Cal.App.4th 1441 (*Glade*). Carla Jean Glade filed a marital dissolution action in 1993. In 1994, the trustee of a family trust brought an action against Carla and her husband seeking to foreclose on a community property residence. The trust brought a summary judgment motion in the foreclosure proceedings. Carla filed an action in the family law court seeking an order to stay further prosecution of the foreclosure action. The family law court stayed the foreclosure proceedings pursuant to Code of Civil Procedure section 526, subdivision (a)(6), which permits injunctions where the restraint is necessary "to prevent a multiplicity of judicial proceedings." The family court also cited *In re Marriage of Van Hook* (1983) 147 Cal.App.3d 970, which held that a trial court may grant a preliminary injunction restraining a judgment creditor of one spouse from executing on community property involved in a marital dissolution proceeding. When the trustee's summary judgment was granted in the foreclosure action, the Court of Appeal reversed, holding that the summary judgment in the foreclosure action should have been denied. The *Glade* court specified, "Given the family law court's broad jurisdictional authority where the right to and disposition of community property are concerned, we conclude that . . . the family law court had priority of jurisdiction here." (*Glade, supra*, at p. 1450.)

*Glade* is distinguishable from the present matter. First, the family law court in that matter cited specific legal authority for its decision to enjoin the foreclosure action. The conservators have presented no such authority for the act of the probate court in

attempting to prevent Britney from testifying in this matter. Second, the *Glade* court specifically restricted its analysis to situations involving the family law court, where the court has broad jurisdictional authority over community property. The conservators present no authority suggesting that the probate court has jurisdiction to restrict testimony of its wards in separate matters where the ward's testimony is relevant.

### B. *Exclusion of exhibit 11*

Sam claimed that James sent him a text message on December 17, 2007, which read: "If and when I met u [*sic*] one thing is going to happen I am going to jail and ur [*sic*] going to the hospital." (Exh. 11 (excluded).)

The trial court excluded the text message from evidence. Sam's counsel represented to the court that the text message was "1 of 25." The court expressed a desire to see the text messages that surrounded the text that Sam wanted to enter into evidence. Sam's counsel stated: "[W]e don't have them. Only that text message[] was preserved from sequence. [Sam] can testify to what was discussed in the . . . text messages leading up to it." The court stated, "Well, I believe that even if there were two or even if there was one that involved the same alleged incident with the same text . . . that I should see the one before it. Maybe it was they were making a movie." The court suggested to Sam's counsel that he attempt to get copies of the text messages surrounding the one he sought to enter into evidence. Until then, the court's position was, under Evidence Code section 352, if there is "a conversation before and a conversation after, just like a telephone conversation or any type of conversation in person, you're not -- you're taking it out of context and it could be misunderstood, misread, confusing, take too much time." However, the court stated, "if your client finds anything that will help clarify the actions or the events before and after, I will revisit it."

We review a trial court's ruling on the admission or exclusion of evidence under Evidence Code section 352 for abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) "We will not overturn or disturb a trial court's exercise of its discretion under [Evidence Code] section 352 in the absence of manifest abuse, upon a finding that

47

its decision was palpably arbitrary, capricious and patently absurd. [Citation.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

Sam argues that the text message was highly probative and unlikely to cause juror confusion. It demonstrated James's malice and intent to harm Sam. Sam argues that given the high probative value of the exhibit, and the low potential for juror confusion, the court's decision to exclude it under Evidence Code section 352 exceeded the bounds of reason.

We disagree. The court's decision is well within the bounds of reason. Contrary to Sam's argument, the text message was not the only evidence of James's malice and intent to harm Sam. Such malice and intent could be deduced from Sam's testimony regarding the events surrounding the alleged battery. Furthermore, we find that the trial court was reasonable in showing concern that the text message was taken out of context. Sam's counsel represented that the message was one of a series of messages going back and forth between Sam and James. The text message was sent over a month before the alleged battery took place. There is no way of knowing what prompted the alleged remarks in the text or whether they had anything to do with the circumstances that led to the alleged battery over a month later. No abuse of discretion occurred.

## DISPOSITION

The order granting Lynne's motion for nonsuit on Sam's cause of action for defamation is affirmed. The order granting James's motion for summary adjudication on the intentional infliction of emotional distress cause of action, and the emotional distress component of the battery claim, is affirmed. The motion for nonsuit on Sam's breach of contract claim against Britney, and the motion for nonsuit on Sam's battery claim against

James, are reversed.  Those two claims are remanded for trial.  Each side to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.

CHAVEZ

We concur:


_____, P. J.

BOREN


_____, J.

ASHMANN-GERST